Thank you very much as well, Ms. Pinuccio. We appreciate the help. Okay, come on up for case number three. Take your time to get set up. I'll go ahead and call the case. Dudley Teel v. Deputy Sheriff Jonathan Lozada, case number 22-11106. Mr. Rubin. Yes, good morning, Your Honors. Guy Rubin on behalf of Dudley Teel, who is here in the courtroom. Susan Teel was lying in her own bed, calm and posing no threat to anyone when Deputy Lozada entered her bedroom, gun drawn, ordering Susan to, quote, show me your hands. In Teel v. Lozada, we'll call it one, the We weigh the government interest at stake by examining the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she's actively resisting arrest or attempting to evade arrest by flight, keeping in mind that the reasonableness of a, quote, particular use of force must be judged from the perspective of a reasonable officer on the scene rather than 20-20 vision of hindsight. The use of deadly force is reasonable only if the suspect poses a significant threat of death or serious physical injury to the officers or others. This court went on to say, as in Mercado, because the situation does not involve a criminal arrest, our facts do not fit neatly within the Graham framework. Indeed, because Florida does not attempted suicide as a crime, it's impossible for this court to measure the severity of the crime at issue. And the next phrase is the critical phrase in this appeal on this point. We have little trouble then concluding that this Graham factor weighs in favor of Dr. Teel. In instructing the jury, the trial court ignored that directive. Mr. Rubin, I know you were citing to the Teel 1 decision, but the Teel 1 decision is a summary judgment case, and here we're at a different procedural posture. We're here with a jury verdict that found that Officer Lozada did not use excessive force, correct? Indeed, yes. And you agree that that is a different procedural posture? It is, no doubt. And then obviously when Teel 1 decision was issued, the court was obligated to view the evidence in the light most favorable to the non-moving party. Yes. However, the standard doesn't change whether at any stage of the proceedings, Graham is Graham, and the only trial court... Graham is not an exhaustive list, correct? That is correct. And in Helm, we had a situation where we used a different framework. We used Graham, but we talked about instead of the severity of the crime, we had a different analysis, correct? And we cited to the decision, I can't remember now the name of it. Hill versus Miracle. Yes, for Miracle. And we cited that to it in favorably. Well, that is true, and I'm very much aware that there... That is a published case as opposed to Teel 1. Yes, and certainly aware that Your Honor and Judge Jordan participated in that opinion, but that opinion is on a completely different set of facts. That was a minor girl at a concert who was held down by four officers, and the issue there was whether or not the incident was clearly established. We don't have that issue in our case. In our case, the question is whether or not the jury was properly instructed on the law. But here... So let's... Officer, we have to view the verdict and the facts. Let me put it back up. We have to view the facts in light of the verdict now, right? Yes. Okay. Officer Lozada testified in part that Ms. Teel continued to come at him with a knife in her hands and said some things which basically indicated, I'm not going to stop, shoot me, kill me. Suicide by cop. Right, right. And so under those set of circumstances, Officer Lozada testified, Deputy Lozada testified, that he thought that she was engaged in at least aggravated assault. If you got the jury instruction you wanted, the argument would have been that by advancing on him with a knife in her hands, with the blade pointed downward and the shaft pointed up toward the ceiling and held at some point above her head, that she was committing aggravated assault upon him. How would the requested jury instruction have helped you? Because the jury could have considered all of the factors in proper context and weighed Deputy Lozada's testimony against those factors. She was moving slowly. Whether or not something is, whether the actions of Mrs. Teel was an aggravated assault would have become part of the analysis by the jury. But it would have been harmful to you. You completely omitted the instruction given by the district court. Maybe I'm just seeing the case differently from a lawyer's perspective or a judge's perspective, but the instruction the district court gave eliminated the whole notion of a crime. Wasn't that beneficial to you? I don't think so because I think any reasonable jury would understand that the 911 call was a call to help this woman who was in a mental health emergency. She was not committing a crime. She was in her bed doing nothing when Dr. Lozada, when Deputy Lozada got to the doorway and saw her laying there. She was not threatening herself. She was not a threat to others. But that's not the testimony that came out at trial. You're not evaluating that at that point in time. You're evaluating it at the time of the use of force case. Well, the jury is entitled, I believe, to consider the totality of the circumstances. That is what the law requires. And so the totality of the circumstances would allow her lawyers to argue, was there a crime here? There was no crime here. And the jury could consider was there or wasn't there? And is this a factor to consider that would benefit or hurt the other? So you wanted this instruction and then you wanted also another instruction that she needed to be Baker acted. Well, we didn't request a Baker Act. This was part of the defense that he was there to do something. We're talking about Deputy Lozada. The argument was Deputy Lozada was there to do something he was required to do on this kind of a call. And so the defense requested the Baker Act instruction. We objected to the instruction. And then the version of the instruction gave only one half of the statute, which did not give the jury the full understanding of what the law requires. So that part of it was a misstatement of the law. As I understand the procedural chronology, the defense asked for a Baker Act instruction. You oppose it, but said, if it's going to be given, it should be the whole thing. Yes. Right. Do I have that right? You have that right. And I know there's an argument that we waived. We very specifically put on the record. We're agreeing to the language that is going in conditionally and preserving our rights, because we don't think that there should be any language. Under our existing precedent, you have to show, even if assuming that it was a misstatement of law, you still have to show that there was actual prejudice. So what would be the prejudice by not giving the full instruction? Because, again, this is an excessive force case. So on... You agree that you have to show actual prejudice. Likely prejudice. So on the first jury instruction that we're complaining about, which is not a recognized instruction, it's not been accepted by any other circuit other than the 6th for mental health situations. So the instruction went from whether a suspect poses an immediate violent threat to others, that's Graham. To, this is the one that was used, whether the subject poses an immediate violent threat of force to others or herself. This is a situation where the testimony was from Mr. Teel, that when he came in and he was able to open the door, he found her stepping out from a bathtub that was full of water and she had cut her wrist. So had she not harmed herself? There's no doubt that she harmed herself, but here's what the instruction allowed the jury to consider. And this is not the Graham, this is what was given. Whether the subject poses an immediate violent threat of force to others or herself. So this instruction would permit the jury to decide that Lizada could be justified to use deadly force if Susan Teel was attempting to harm herself. That is not the law. If someone is actively trying to commit suicide, or even suicide by cop, deadly force is not permitted. Remember that Lizada never said drop the knife, never gave a warning. He had plenty of time to do all those things. He said don't come. Yeah. I don't remember exactly what he said, but don't come forward or something. Right. He's basically, he uttered some words that were not directives other than stay where you are. It wasn't put down the knife. It wasn't I'll shoot if you don't. I understand that, but again, we're not finders of fact and we're not, we don't make determinations of credibility. The fact finders did. And in this case they found, and they found that there was not a use of excessive force. I mean, that's, that's the finding of fact that we have before us. Correct. And, and we believe that the jury instructions were incorrect statement of law, not the, the pattern instruction that has been provided. Even in mental health situations, yes, the factors should be flexible, but they shouldn't be changed and become misleading and allow the jury to do something that's based upon. Let me ask you a question about that. If judge Middlebrooks had used the pattern jury instruction on excessive force, what he would have told the jury, among other things is quote, when making a lawful arrest, an officer has the right to reason, to use reasonably necessary force to complete the arrest, but he wasn't there to make an arrest, was he? So whenever Lozado was there for, it was not to make an arrest. The, his intent, his testimony, his intent when he got there, he said, my plan was to go forward with a Baker Act, but I never got. That was a more accurate way of putting it though. All I'm just saying is if the judge had instructed the jury the way you wanted the instruction and had used pattern instruction 5.4 and said quote, when making a lawful arrest, an officer has the right to use reasonably necessary force to complete the arrest. If I remember the jury and I heard that instruction, I would have asked myself, was he there to make a lawful, what lawful arrest was he there to make? It would have been confusing and misleading because even assuming arguendo, this was suicide by cop, suicide itself is not a crime. And so he couldn't have arrested her for that. All I'm saying is it's, it's seems to me that if he had given the, this instruction, the way the pattern reads and the way you wanted, it would have misled or could reasonably have been thought to mislead the jury. Am I missing something on this? When making a lawful arrest as the introduction to the whole thing, from the trial lawyer's perspective, your honor, what we're looking at is what is the jury considering? And if the jury is considering that a law officer comes up the stairs with a gun drawn and recognizes that there's no threat or continues with gun drawn and invades that 20 foot and puts himself into again, you are, you are the testimony that came out at trial is that she had a gun, a knife that was aimed at the officer. So I understand, but you're still treating this like it's a summary judgment case and that the facts are what your complaint alleged, alleged, and that's not what we have before us. What we have before us is a testimony that was presented at trial and that the jury found credible. I understand. But to get back to what judge Marcus is focusing on from a, from a trial lawyer's perspective, if we have a, when a judge instructs a jury, you want to make sure that the instruction itself in some reasonable way wraps around the facts that were presented to the jury. And you don't want to tell them something that's going to throw them way off base. And I'm just asking you whether that wasn't a legitimate consideration that if judge Middlebrooks had given the pattern when making a lawful arrest, the jury would have been left to wonder what lawful arrest was he making? If suicide isn't a crime, isn't that a legitimate consideration for a trial judge in instructing a lay jury? I don't think that the judge can change the factors as a matter of law. And the lawyers are able to explain so that the jury is not confused that the law provides for these factors. If a factor is absent and it weighs in favor of... Didn't the Supreme Court in its analysis in a recent Supreme Court case, when it considered the factors, didn't it itself change the factors? I'm sorry, I... There's a recent Supreme Court case that when they talked about the factors, they discussed it and not in the severity of the crime. They've made it very clear that this is not an exhaustive list, that these are factors to be considered, but they're not the end all be all of the factors. I mean, we have to be able to be malleable and be able to give instructions that are based on facts that are presented to a jury. Police officers get these factors because they are in a position of carrying firearms and taking the liberty away from people. And so we have, by the Supreme Court and Graham, we have factors to consider. If two of the factors simply aren't there, then the 11th concluding that these factors weigh in favor of the plaintiff because they don't exist in this analysis. Now the other three factors may... So your argument basically is someone could be holding a knife or... And if it's not a crime because it's suicide by cop, that therefore you should be able to argue that the officer is not allowed to use excessive force. Well, they can and they did argue that there was a crime in this case of aggravated battery. So it didn't deprive the defense of anything. But we got deprived of talking to the jury about the law and the instructions that they're going to get. So we couldn't talk about that, but they could. We think that's fundamentally unfair. You want to take a minute to address the rough patch issue? We'll give Ms. Barranco some additional time if she needs it. Thank you, Your Honor. So in Deputy Lozada's deposition testimony, he said, quote, I had a few rough years. And we went into that very specifically and he talked about how he had disciplinary infractions primarily during 2016 and 2017. This incident happened in July of 2017. A major incident happened 40 days earlier, maybe 42 days earlier, in June of 2017, where Deputy Lozada was at a gas station. And on a suspected DUI, he implemented a takedown, which was caught on video, on body cam. It rendered this subject unconscious. It could have killed him. Anybody who is rendered unconscious, that is deadly force. Here's the question, though. The standard for the use of force is decided under objective reasonableness, right? Yes. This sort of evidence, and I think you say it in your brief, goes to something akin to state of mind. How is state of mind relevant when the standard for the Fourth Amendment use of force is objective reasonableness? How do you fit those two things together? Because the jury is ultimately going to be asked, what would a reasonable officer be doing under these circumstances? Deputy Lozada was not an average reasonable officer. That's the argument. Deputy Lozada. You can't look at it from that. That's my question. You can't look at it from that perspective. You can have a police officer who has been exemplary during 30 years of service. You can't put that good state of mind into the record because the standard is objective reasonableness, but the other side of the coin is you also can't use a bad state of mind, too, because then you sort of introduce subjective standards into the equation. Am I missing something? Deputy Lozada said during this time, I was irresponsible. I was immature. I wasn't following general orders. That's a statement against interest, which doesn't only relate to the prior instances, but relate to the day of the incident. To what issue on the date of the incident, the standard is objective reasonableness? Again, if he's providing testimony on the witness stand and he's the only eyewitness, the jury has, I think, the right to hear whether or not he's got the ability to accurately recite his memory. So it goes to credibility or it goes to intent? I think it goes to impeachment or what? I don't think it goes to intent. I do think it goes to credibility. I think it goes to impeachment. You normally can't introduce collateral acts evidence to then impeach on those, right? Well, so this is tied into our other point on appeal with regard to Sheriff Lohr, who was given summary judgment in this case. He was the and not on administrative suspension had Sheriff Lohr put him on suspension while the discipline was being determined. And remember that Deputy Lozada was very quickly found to have been in violation of excessive force in the Wawa incident. And so by the time we get 40 days later, he would not have been there to do this. But the evidence, the rough patch evidence was considered at the Monell summary judgment stage, right? You're just complaining about its exclusion at trial. Well, I think the two are tied in together and so it's a complicated question. No, but I think you really are saying two separate things. I am. You're saying one, this prior similar act evidence was admissible. It was an abuse of discretion not to let it in because it went to the state of mind of the shooter and his state of mind was relevant. That's one point you're making. The second point was a different point and it really didn't go to the question of state of mind. But I want to just ask you a little bit more about this state of mind testimony. If you wanted to put it in under 404B, that would be the only basis that you couldn't put in the prior acts, bad acts to show propensity. Laws is clear as a bell. That's what the rule says. You can put it in for other purposes like showing motive, intent, modus operandi, state of mind. But I think the question here is why would state of mind be objective? We ask whether under all of the circumstances in this case, whether a reasonable officer would have done what Lozado did, not what his state of mind was, good purpose, bad purpose. That's really not the issue in an excessive force case, is it? It isn't, but these are always mixed questions because the officer is always allowed to testify what were you doing that day? What were you thinking when you got the call? What did you know and how did you feel about it? What you're trying to do is not ask him what he thought that day, but to say, look at these other things he did in the past, a week, a month, a year, two years earlier. That's different from what was moving him on that day. But I'm just trying to ask you, how does his state of mind bear on the objective reasonableness of his conduct, which is the touchstone of what we're looking at? I don't think it goes to a jury's analysis of what a reasonable officer would do, but I do think that when an officer says, I was going through a very difficult period where I admit I was irresponsible and immature and I wasn't really paying attention to the rules, I think that is within appropriate cross-examination when the officer has been permitted to talk about all of the things he did which were within the rules. So it's appropriate cross-examination. Okay, Mr. Rubin. We've taken you way over your time, but you've saved all of your time. Thank you. Thank you. Good morning. May it please the court. Summer Barenko here on behalf of the appellees who are defendants, Deputy Lozada and Sheriff Lohr, who has since been succeeded by a different sheriff of Indian River County. Listening to your Honor's comments while opposing counsel was up here, I feel that a lot of what I felt obligated to write out the box, say to you all, perhaps I need to say at least not as loudly as I thought maybe I would have had to say. Let me ask you one question. Yes. With regards to the excessive force instruction, I can understand substituting the phrase, the severity of the risk of harm for the phrase, the crime severity, given the factual circumstances here and adapting the pattern jury instruction. I can understand that completely and Graham and other cases say that the factors aren't talismanic and that they can be adapted to different situations. So I get that. But what about the addition of the phrase harm to the person's self? I mean, it seems odd to allow a police officer, at least as set out in the jury instruction, to use deadly force to prevent a person from harming himself or herself. In other words, if you have a person, and this is a different fact pattern, but I'm going to use it to try to make the point of where my partial concern is coming from. You have a person who has a small knife, enough to do harm to oneself, but not to really anybody else. And that person is starting the process of slitting his or her wrists. Police officer comes upon the scene. It can't be the law that the police officer says to the person, stop trying to hurt yourself. And the person says, no, I really want to end my life. And the police officer shoots and kills. That can't be the Fourth Amendment standard, right? You're right, Your Honor. And that's not what the jury instructions that were read to the jury. So help me with the instruction. Didn't the instruction talk about harm to not only the officer or other people, but harm to oneself? Well, it spoke to a risk of harm, a concern about harm, and that dovetailed with the instruction that the judge also gave regarding the Baker Act. That's a different instruction, right? That was just preceding the instruction, Your Honor, that was given to the jury. Here's the part that was changed. Whether the subject poses an immediate violent threat of force to others or herself. Why is that an appropriate tailoring of the pattern instruction for excessive use of force? Well, Your Honor, I'm looking at the order that Judge Middlebrooks issued on the jury instructions and his revisions thereto, which is at documentary 199, and it refers to whether a specific use of force is excessive or unreasonable depends on factors such as the severity of the risk of harm, whether the subject poses an immediate violent threat of force to others or herself. Right, that's the little portion I'm focused on right now. Why should the threat of harm to oneself, the suspect's, the subject's self, be a factor in the use of force analysis? Well, that would come into play, Your Honor, in terms of what type of force would be permissible when the deputy is attempting to take the person into custody, civilly commit them under the Baker Act and the concern as to whether or not that person might harm themselves in doing that. Unfortunately, as everyone is aware, this incident rapidly unfolded from a Baker Act to an aggravated assault of a deadly weapon by Mrs. Teel on Deputy Lozada, and so at that moment in time, frankly, he could have been there at the Teel residence for a party that day. It really, that's kind of almost a red herring. The reality, and as the jury heard during the trial, that moment in time, his life is being threatened by Mrs. Teel, and I know there may have been some confusion previously when this was up on appeal. There's no confusion that she had this knife raised over her head, dare I say, in a horror movie style situation. There was no confusion in that courtroom when we tried this case in February of 2022 that Mrs. Teel was threatening Deputy Lozada's life on that evening when he was there trying to help her, and he had every intention of wanting to help her. Unfortunately, she'd already harmed herself such that a lot of the, what I know some folks might refer to as alternative options, really weren't available to him. He was trying to help her, and in the moment, it turned into a deadly force encounter, and as he testified to the jury, that is why he had to use deadly force. I think what the judge was trying to do was draft a jury instruction that explained to the jury kind of the big picture, the Baker Act part of the case, the deadly force part of the case, but the truth of the matter is that the issue that they were there to decide wasn't whether or not the Baker Act was negligently undertaken, anything like that. It was whether or not his decision to use deadly force in the moment, whether or not that was reasonable, objectively reasonable under all of the circumstances as known to Deputy Lozada at that time. Wouldn't it have been wiser, however, to leave out the language, just the words, or herself? I understand why he tailored it to a Baker Act case, not to going out there to arrest her in the first place, but or herself suggests something else. Now, whether that's a big deal or not on the constellation of this case is a different question, but wouldn't it have been wiser just to knock out those two words? Well, dare I say everything in hindsight is 20-20. Well, I appreciate that. I don't think as written, I don't believe it misstates the law, Your Honor. I don't have it in front of me, but I think it's almost paraphrasing the actual Baker Act language. Yes, and I think that was what is ... I think that that is the issue is that it's the same language as in the Baker Act instruction, which is taken from the statute. I believe you're correct, Your Honor, yes. I may have been better not to have it, but I think it was the language that was used, and it's actually the language in the Baker Act statute. He was using it to tie it into what this was, which was a Baker Act case. Absolutely. Rather than making a lawful arrest kind of case at the outset. That's correct. I think the judge was trying, and the totality of the jury instructions clearly does show, explain to the jury, well, what is a Baker Act? Law enforcement officers are allowed to civilly commit somebody. As Your Honor, Judge Marcus, I believe you pointed out earlier, not all of these seizures are the same. I hear somebody's voice. I'm hoping not. Looks like we have a third party who wants to be heard. This is all ... Now, we're in the process of getting the lemurs upgraded. Ben? Hold on one second. We'll make sure we get it sorted out. It looks like we've had a line feed over. Okay. Let's continue if you can, Ms. Barranco, and hopefully we've taken care of that little problem. No problem, Your Honor. It's not the first time I've had interruptions. Apologies. No fire alarms this time, I think. When you look at the jury instructions in this case, they were attempting to construct a jury on what actually Deputy Lozada was confronted with. It wasn't your typical arrest or investigatory stop that's talked about generally in the Graham case, but Graham makes it clear that the Fourth Amendment, as Your Honors have already stated, governs all types of seizures, whether it's something like this, a civil commitment, or an investigatory stop. This was, I believe, a proper way for the judge to try to accurately reflect the state of the law to the jury without confusing them. I do believe, and it was argued in the briefs, that if Judge Middlebrooks had just said, well, I'm not really sure what to do. I'm just going to throw in all those Graham factors as they existed in Graham for that investigatory stop that existed in Graham and let the jury figure it out, I would submit that that would have confused the heck out of them. Because, as I think it was Judge Marcus stated, there wasn't an arrest here. There never was an arrest, and unfortunately, because of the way things evolved rapidly, it became a deadly force encounter. As stated in the briefs, and as I know Judge Legault has already pointed out, this isn't a summary judgment record. This is a jury verdict in favor of Deputy Lozada, and the jury instructions are proper and do not misstate the law that applied here. There's no dispute, I don't think, that the Graham factors or the factors that a jury can consider in looking at whether or not the use of force is reasonable or not aren't written in stone. It's much more fluid than that, and I know the United States Supreme Court, Scott v. Harris, said that specifically. It's not a rigid framework. You have to always slosh your way through the fact-bound morass of what happened, and that's exactly what Judge Middlebrooks did, and whether or not those two words are in there or not, I don't think that impacts the way it reads or whether it prejudiced the plaintiffs in this case. I think it was proper for at least some of the Baker Act to be read to the jury, so at least they had an understanding of what was going on on this particular date. I know that the other side had specifically said, well, we want all or nothing, and in our brief, I know we stated that well. By doing that, frankly, they admit and agree that it was proper what was read. I would agree with . . . That's not exactly right. Well . . . You can say that it may not be a winning argument, but you can certainly make a contention that reading only a portion of a statute is misleading if taken out of context and you need the whole thing to be able to understand it. Now, in the context of this case, it may not be prejudicial error, but the argument is not a crazy one. I didn't call it . . . You're always told . . . I didn't call it a crazy one. . . . statutes. I understand. So you can make the argument that, hey, I don't want a snippet of it. I want . . . if you're going to put it in, I want the whole thing in. The argument is that the snippet was fine. And I would submit to the court, based on the arguments and the evidence in the case that the jury was presented, that it made all the sense in the world for Judge Minow-Brooks to just put in the part that he did about the Baker Act, kind of what it was. The Baker Act, the language of the statute has an or, correct? Correct. The portion that was used was the portion that was applicable, which was the harm to self. That's correct. And there wasn't any evidence . . . There's another portion of the Baker Act, but that wasn't relevant to this case. Correct. Again, that was an or. Correct. I mean, the part that wasn't read really wasn't an issue. I want to say it was you, Judge Lagoa, early on in this discussion that said that there was no issue about the fact that she . . . it might have been Judge Jordan . . . that there was no issue about whether or not she needed to be Baker Acted. So, it really wasn't for the jury's consideration, and frankly, it probably would have confused them more to start reading all of these different options in the Baker Act statute and whether or not all of those things were checked off. The Baker Act is whether or not you need someone's consent, but you don't need consent to Baker Act them if they're going to harm themselves. And that's the or portion of the Baker Act statute, and that's what was used here. Correct, Your Honor. And not only did she, Mrs. Teel, say that she was going to harm herself, she actually, in fact, did harm herself, which was one of the components of this case that, frankly, gave some urgency to Deputy Lozada and why he felt compelled to not just lay eyes on Mrs. Teel, but actually make sure that she wasn't bleeding out. And unfortunately, that is the point in time that she got off the bed with a large 13-inch kitchen knife raised over her head and came at Deputy Lozada. I know we spoke earlier about the rough patch issue, and I see my time is out. You have another minute to address . . . Thank you. Thank you. Just briefly, the whole rough patch issue, it's the defendant's position or the appellee's position that it was not an abuse of discretion for the judge to not permit that into evidence during the trial. Pretrial counsel for Dr. Teel had only submitted that he was going to try to get into the rough patch evidence by way of against the sheriff's office, and then the sheriff was granted summary judgment. Notwithstanding that, plaintiff's counsel, appellant's counsel, is now seeking the argument that the rough patch issue should have come in during the trial. There's no mistake about what the rough patch was. I think counsel for the other side coined that from the testimony of Deputy Lozada when he explained he had a rough year and had gotten into some trouble at the sheriff's office because he was young, and the trouble he got into was not abiding by a pursuit policy, and then has been referred to as the Wawa incident. It was a takedown of . . . I understand it, Ms. Barranco. Yes. Offering it not for the truth of its contents, but simply insofar as it goes to the state of mind of the shooter. That's the basis under 404B that he would have said it was relevant and otherwise admissible and an abuse of discretion for not admitting it. Is state of mind of the shooter a relevant consideration for the jury on an excessive force case? No, it's not. It's clearly an objective standard, as the panel has already stated. It's an objective standard. It is based on what was known to Deputy Lozada at the time of the incident, but that's something different than his state of mind. We changed the circumstances of the 404B evidence. 6-8-17, he used excessive force wrestling a suspect to the ground. This was the Wawa incident. Suppose instead it had involved wrongful death, shooting, and the same issue had come up in an earlier case. Would it be more relevant if the nature of the incident was closer and involved the use of deadly force? Would it still be irrelevant because it only went to state of mind? It would still be irrelevant. It might be more similar. Well, it certainly would be. Sure. That was another problem, and we haven't discussed it so much on the Monell summary judgment motion that the sheriff was granted. The other things that Deputy Lozada had gotten in trouble for, which by for, were so dissimilar to what happened here with Mrs. Teel that they weren't relevant, and on top of it, clearly are not relevant because it's an objective state of mind standard. It's our position that under the law, the trial court judge properly omitted the, I'm going to put air quotes, rough patch evidence. And from the trial and also in granting the summary judgment for the sheriff. Let me ask you a question about the summary judgment for the sheriff. Issue there is custom practice policy, et cetera, but if a jury finds no excess of force, no constitutional violation in the first place, then wouldn't the rest of that become moot? Yes. So you'd never really have to get to whether there was a policy or practice or not, would you? That's correct. In fact, that's exactly what happened to Judge Middlebrooks when he initially granted summary judgment to the defendants. He just made a finding that Deputy Lozada hadn't violated the Fourth Amendment, and then that mooted everything else in terms of the custom policy issue, but you're absolutely right. So if the panel believes, as I believe it should, that Deputy Lozada properly used or at least didn't violate the constitution, the custom policy issue is moot. Right. So the verdict is sustained. He can't win as a matter of law on the Monel issue. Absolutely. That's your position? Yes. Thanks. Okay, Ms. Branko, thank you very much. Mr. Rubin, could I ask you to begin where we just left off? You assert here that the district judge erroneously entered summary judgment on the Monel claims against the sheriff in his official capacity. If the verdict is sustained and the verdict involved a finding that there was no excessive force, no constitutional violation, no violation of the Fourth Amendment, then whether they had a good policy or a bad policy would be of no moment. Wouldn't that issue be mooted? I think it would. So that argument, so your challenge to the summary judgment turns really on the resolution of the first set of issues. I think it does, and it also, in our view, impacted the decisions that we had to make. For instance, we voluntarily dismissed negligence claims against the sheriff on the day before trial because we couldn't get the evidence in. And of course, if the evidence against the sheriff comes in on prior instances, it changes the complete complexion of the case as it relates to what the jury understands about Deputy Lozada's history. So let's talk then about this 404B evidence, these prior crimes, wrongs, or acts. Why was there an abuse of discretion? The reason I ask it is four of the six incidents involved driving too fast. Has nothing to do with an excessive force case, does it? Why would the district court have abused its discretion with regard to the four of those incidents saying it just doesn't relate in any way, shape, or form to the excessive force claim? So if we're talking about the sheriff's liability? No, I'm talking about in this case, your claim is that the district court erroneously kept out this rough patch evidence. It goes, forget that it would go to the summary judgment, but it goes more basically to the underlying excessive force case against Lozada. So I'm asking with regard to Lozada, why would it have been an abuse of discretion to keep out four incidents that involved driving too fast? I think the trial court can make a determination using discretion as to what is remote to be too far away from Deputy Lozada's state of mind and the nature of his testimony at trial. So there would be no abuse of discretion in having kept those four items out? I'm just talking about those four, there are two others. The further back you go and- It's not just the time, it's not just a temporal problem. The problem is that it has nothing to do with what's at issue in this case, unless I'm missing something. It does and it doesn't. So it's not the plaintiff who put forth the testimony of Deputy Lozada that said, I was experiencing, and it is correct that in deposition, he initially said, I had a rough few years. And then we came back to that topic, it's all in the deposition, we're not trying to hide the ball here. And my question to him was, you talked about a rough patch in those two years, correct? And he said, yes. So he agreed that it was a rough patch. And then we went through all of them. And it was a collective time frame in his life that he was a professional. What does beating have to do with excessive force, a state of mind? So it doesn't. And if it was offered for a prior bad act, it is properly excluded. But when the officer says, during these years, I was immature, I wasn't following rules, I was irresponsible. These are his words. This is proper cross-examination for a defendant in a civil case, when the jury is asked to believe his testimony, which is the only eyewitness testimony in the entire case. I just think that excluding that admission is so critical that it takes away from the jury the true complexion of what happened in the moment on the day that he shot Mrs. Teal. He was facing discipline in two other cases, one a serious one, the Wawa incident. Even before that, he had discipline, which took him off of being on the training squad. So this wasn't an isolated one-off. He was suffering with something. He admitted that he was suffering with something. And the jury, we believe, was entitled to hear it. As it relates to the Baker Act, and I know that, Judge Lagoa, you talked about the or. But the statute itself was given, we believe, in an improper context. So even if you and I can say a jury would have easily found that, it's still up to the jury to find it. So in 394-643 is the criteria for Baker Act. And what the court decided to give was only the B categories, not the A. But A and B are separated by the word and. The B categories is you don't need the person's consent because they have harmed themselves. And as a result of it, under the Florida statute and the law, you don't need that person's consent. And in this case, she had harmed herself. And again, this is not a Baker Act case. This was just in order to give the jury an understanding of what Baker Act is and what you're entitled to. You don't need that person's consent. I mean, she had already, the husband had already testified that she said she wasn't going to go to the hospital. So she was not going to give consent. Well, the question is, what did the officer know at the time? The officer didn't know whether she was agreeing or not agreeing when. So I believe that the proper analysis is. When Officer Lozada, he did know what the husband had told him, which was she's been drinking, she took out a van and she has a knife. Yes, that's what he knew. That's what he knew. That's what he heard. And that she had, I guess, part of the call was that she had harmed herself. Yes, all of that. One hundred percent. Then he has to use his own senses. He draws his gun, goes up the stairs. He stops at the top of the stairs. He visualizes her in bed and now he sees for himself. She's lying down. She's calm. He doesn't see that there's a knife there. She's not doing anything that he perceives as threatening to anyone. And so when we go back to the Baker Act, the reason the Baker Act is red is so that the jury can put things in perspective. Well, if they're going to put things in perspective and if they're going to consider whether Deputy Lozada was actually proceeding on a Baker Act or not. And his own testimony was that was my plan, but I never got to it. So he never was implementing the Baker Act. But in the criteria for Florida statutes, it's one A or B and two A or B. You've gone over your time. We'll give you 30 seconds to wrap up, Mr. Rubin. Well, Your Honor, I'm experienced enough not to gild the lily on any of the points. I think we've explored the points. But the overall message that this sends, this kind of a verdict on this kind of evidence with these kinds of jury instructions and this limited evidence goes counter to everything that we are talking about in this country about giving help to mental health subjects. Lozada knew that there was an entire chapter in his policy and rule book. And he violated, he admitted he violated every single one of those in approaching Mrs. Teal. And what resulted was that a 9-1-1 to give her help with the premise that she is not thinking right ends up in a homicide. That's just not right. And I don't think that the law can excuse it. All right. Thank you both very much. Thank you.